# EXHIBIT A

Filed
D.C. Superior Court
09/20/2022 08:24AM
Clerk of the Court

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

| | |
|---|---|
| **ADRIENNE CORDER**<br>**326 Harry S. Truman Drive**<br>**Upper Marlboro, MD 20774**<br><br>*Plaintiff,*<br><br>v.<br><br>**COMMUNITY OF HOPE**<br>**4 Atlantic Street, S.W.**<br>**Washington, D.C. 20032**<br><br>*Defendant.* | **Civil Action No.** 2022 CA 004284<br> B<br><br>**Jury Trial Demand** |

### COMPLAINT

Comes now Plaintiff Adrienne Corder, ("Plaintiff," "Plaintiff Corder," or "Ms. Corder") by and through her attorneys, and hereby files this Complaint against Defendant Community of Hope ("Defendant," "Defendant Community of Hope," "Community of Hope"). Plaintiff Corder seeks relief pursuant to Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 and District of Columbia common law claims, including but not limited to declaratory, injunctive and other equitable relief, compensatory and punitive damages, litigation expenses and reasonable attorneys 'fees, based on Defendant's discriminatory, harassing, retaliatory, and otherwise unlawful actions against Plaintiff.

### JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this Complaint pursuant to D.C. Code § 11-921.

1

2.      Venue is proper in this Court in that the events and omissions giving rise to Plaintiff's claims occurred here in the District of Columbia and Defendant may be found here.

## PARTIES

3.      Plaintiff Corder is an African American female and a resident of the state of Maryland.

4.      Community of Hope is an organization which operates living facilities and provides health care services to the homeless, low-income and underserved families based in Washington, D.C. Community of Hope is an employer within the meaning of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 and District of Columbia common law.

## FACTS

5.      In September 2019, Ms. Corder, an African American female, began employment at Community of Hope and worked as the Associate Director of Health and Support Services. Ms. Corder has over fifteen years of experience in healthcare administration, human resources management, professional staff training, and community outreach. She has a Master of Medical Science and Physician Assistant degree, a Master of Business Administration in Health Care Administration degree, and a Bachelor of Arts degree in Biology and Chemistry. Ms. Corder also has extensive managerial skills and experience in people relations and entrepreneurship and has received several professional accolades, including the Outstanding Community Achievement Award in 2017 from the Girl Scouts of America organization, the Woman of the Year award in 2010 from the National Association of Professional Women, and the 2016 Leading Woman of

Maryland award from the Daily Report of Annapolis, Maryland. At Community of Hope, she reported to Victoria Roberts, a Caucasian female.

6.      During her first five months of her employment, Ms. Corder completed all assigned tasks without incident. Community of Hope provides all employees with an assessment of their work after their first ninety (90) days of employment. Ms. Corder was informed that the evaluation was completed by her initial supervisor by the ninetieth (90th) day of her tenure, but her initial supervisor resigned before being able to present it to her. This task then fell to Victoria Roberts, Ms. Corder's new supervisor. Ms. Corder asked at nearly every weekly check-in with her supervisor for the evaluation to be presented to her. Ms. Roberts stated that she was not using the original ninety-day evaluation completed by the previous supervisor, and that she was completing another ninety-day evaluation that Ms. Roberts herself wrote. Ms. Corder never received this evaluation or any performance evaluation during her tenure at Community of Hope. This was despite the fact that on February 11, 2020 at 1:22 p.m., Ms. Roberts sent Ms. Corder an email stating that the evaluation was "almost completed" and that they "could discuss it next week hopefully."

7.      During her employment at Community of Hope, Ms. Corder witnessed and experienced several interactions that indicated racial bias in the workplace. First, Community of Hope hired a number of physicians who were enrolled in a federal program which forgave medical school loans for doctors who worked for a number of years in underserved communities. As a result, many inexperienced and culturally insensitive Caucasian clinicians began practicing medicine at Community of Hope, having no connection to the community (Ward 7/8) being served.

As a further result, there were frequent complaints from Community of Hope patients about the quality of their healthcare by Caucasian doctors engaging in dismissive and discriminatory conduct. The population Community of Hope serves in many cases have high acuity patient illnesses that require experienced and culturally sensitive community committed providers for proper medical care. These complaints from Community of Hope patients were brought to the attention of senior management at Community of Hope and continuously no actions were taken to address the serious issues. Ms. Corder was handling one specific case, as previously explained, and the week Ms. Corder demanded for the accused clinician's supervisor to investigate and respond to the patient's complaint with an explanation and corrective actions, she was dismissed. The patient's complaint went unaddressed once Ms. Corder was dismissed and no corrective action was taken in response to the very serious healthcare concern from the patient. Ms. Roberts was aware of the patient's complaint, while Ms. Corder addressed the situation her last week of employment.

8.     Throughout her employment at Community of Hope, Ms. Corder's co-workers routinely cautioned her to rein in her ambitious spirit for fear that she may be targeted. There was a perception at Community of Hope among African American employees that their advancement prospects were limited. She learned that a particular African American therapist employed by Community of Hope was denied a promotion due to her not being licensed, despite the fact that at the time of her hiring at Community of Hope, she was promised to be supported for licensure as other Caucasian co-workers received this licensure support regularly. The therapist did not receive licensure support and was denied a promotion due to the licensure. A Caucasian employee, Zavi

Brees-Saunders, who was responsible for multiple professional mishaps witnessed by Ms. Corder during her tenure, would routinely attribute her mishaps onto her mostly African American team. This practice went on without an investigation for many months, despite multiple complaints from fellow employees to Human Resources. Additionally, Ms. Corder overheard Ms. Roberts make several discriminatory statements, including on one occasion when Ms. Roberts suggested in a leadership meeting that workplace signs advising patients to take COVID-19 precautions were "unnecessary because our patients, don't read anyway." Ms. Roberts' statement was said in a disrespectful and condescending manner that offended many African American co-workers in the leadership meeting. Community of Hope patients are overwhelmingly African American. On another occasion, Ms. Roberts stated to Ms. Corder and other team members under Ms. Corder, that Ms. Roberts would rather not hire a potential employee that worked for years at the District's Southeastern Hospital ("UMC") because of the reputation of the "people" that work at "that hospital." This assumption came without reviewing or taking into consideration the applicant's credentials, skills, or experience. Ms. Corder also observed that some of Community of Hope's executive team subjected its African American female employees to unnecessary micromanaging, condescending, belittling, and argumentative behaviors within the workplace, unlike how they treated Caucasian employees.

9.      At Community of Hope, Ms. Corder worked to facilitate virtual training and cross-training for both individual and groups of employees to train staff safely during the COVID-19 pandemic. Such training was planned for different departments by request, such as the Dental team, referral specialists, and members of the medical teams. Ms. Corder also worked to ensure

5

consistent and updated record-keeping, such as the queues for medical records and those for referral specialists. Ms. Corder led Community of Hope's first digital patient satisfaction survey collection process, which was more productive, quicker, and complete than the prior years' survey collecting process. In her role as the Associate Director of Health and Support Services, Ms. Corder also screened and interviewed potential new hires for many positions within her team. Ms. Corder's work included creating a Call Center Remote Work Plan and successfully completing the Meaningful Use Reporting to the District of Columbia, which brought Community of Hope over $30,000.00, in Meaningful Use bonuses that Community of Hope had not received prior to Ms. Corder's efforts.

10.    On or about February 26, 2020, Ms. Corder's own issues began after she addressed a micro-aggressive comment that Ms. Roberts made in response to Ms. Corder's question about supervising a new grant. Ms. Corder first asked Karen Jennings, a member of the Human Resources Department, about the grant and its budget and Ms. Jennings told her to ask Ms. Roberts. Following Ms. Jennings' advice, Ms. Corder asked her supervisor about an increase in her salary as reflected on the grant budget for the Director Level Management to receive a portion of the grant for supervision and management. After Ms. Corder acquired a grant to manage under her supervision, she asked if she was to receive the allotted funds for her work on the grant as reflected in the grant budget summary. The grant's budget had a line item for 1% of the grant supervision, which Ms. Corder was tasked to do in addition to her other job duties. Ms. Corder asked about this budgeted line item in a normal weekly check-in with Ms. Roberts. The micro-aggressive response

6

from Ms. Roberts was, "[w]hy would you ask for that? We pay all your bills with your salary. No, you don't get that and that's not the way CoH does things."

11.    Ms. Corder simply referenced her previous work in grants and her experience with getting paid from portions of grant budgets. Ms. Roberts then explained, with a condescending and micro-aggressive tone, that Community of Hope manages budgets of grants differently. The following day, Ms. Corder again reached out to Ms. Jennings and asked her opinion on Ms. Roberts' comments. Ms. Jennings stated that the comment was "unprofessional" and advised Ms. Corder to bring up how she felt with Ms. Roberts in their next check-in the following week. Ms. Jennings stated that Human Resources would normally get involved to assist in addressing an issue of this sort, but that she was confident Ms. Corder could discuss the issue with Ms. Roberts herself. Prior to this time, Ms. Corder had always prepared the agenda for the meeting and would send it to Ms. Roberts minutes before or during the meeting. After this meeting, Ms. Corder would send a recap to her supervisor to go over things the two had discussed. It had never been a problem in the past and Ms. Corder and Ms. Roberts had never had any communication issues whatsoever. Ms. Corder and Ms. Roberts had a great working relationship prior to Ms. Roberts' comment that made Ms. Corder uncomfortable.

12.    At the end of their next check-in the following week, Ms. Corder mentioned how she had felt offended by Ms. Roberts' comments since the last check-in the previous week. Ms. Roberts claimed that she did not recall the statement —though she was able to recall other details of the interaction— and said that she was sorry if something she had said came out wrong. Ms. Roberts also stated that she had no interest in Ms. Corder's bills and that Ms. Roberts did not recall

or have any reason to say such a thing to Ms. Corder. At that moment, Ms. Corder concluded that Ms. Roberts would lie when convenient and that she had to be careful in her interactions with her.

13.    The following day, Ms. Corder received a very long, detailed email from Ms. Roberts in reference to the micro-aggressive comments which reviewed everything that Ms. Roberts did remember saying and restated that Ms. Roberts did not recall the insult. Ms. Corder did not reply to Ms. Roberts' email. Ms. Roberts did not attend check-in for the following week.

14.    The check-in was rescheduled for March 11, 2020, one week later, via Microsoft Teams. Ms. Corder was working from home for reasons related to the COVID-19 pandemic. Ms. Corder was surprised to see Ms. Jennings from Human Resources on the video call as well, something which was new to her check-ins with Ms. Roberts. Ms. Corder asked Ms. Jennings why she was present for this check-in and Ms. Jennings responded that Human Resources wanted to be present for this check-in and take notes because Ms. Corder and Ms. Roberts were having "communication issues."

15.    Ms. Jennings's answer disturbed Ms. Corder because she and Ms. Roberts did not have communication issues, and this was simply a case of Ms. Roberts having selective memory when it came to her micro-aggressive approach in dealing with Ms. Corder's simple question — asked with the advice of Ms. Jennings— about a portion of the grant Ms. Corder was "newly" assigned to manage. Ms. Jennings became a witness from that point on in the weekly check-ins and Ms. Corder felt very strange about Ms. Jennings's and Community of Hope's behavior.

16.    After the March 11, 2019 check-in, Ms. Corder contacted Ms. Jennings to ask about her intentions in sitting in on the check-ins with Ms. Roberts, which had never been necessary

before. Ms. Corder had always been transparent with Ms. Jennings, even asking for her advice about the grant and the budget before being directed to ask Ms. Roberts. Since Ms. Jennings was sitting in as a witness for Ms. Roberts during weekly check-ins while also knowing Ms. Corder's concerns, Ms. Corder now felt that Ms. Jennings and Ms. Roberts were looking for a reason to terminate her employment.

17.    Over the next weeks, Ms. Corder expressed to Ms. Jennings how increasingly uncomfortable the professional relationship was becoming and how she felt that she was being treated differently at Community of Hope from her experience at Community of Hope prior to March 2020. Ms. Corder asked Ms. Jennings if Human Resource's presence in the weekly check-ins was part of some sort of disciplinary action and asked for a mediation plan to address the issues. Ms. Jennings assured Ms. Corder that she was serving as an unbiased witness and nothing more, but Ms. Corder still had a feeling that she was being set up to be fired. A mediation plan was never presented despite the many requests by Ms. Corder and despite the fact that a mediation plan is an available option listed in the Community of Hope employee manual. Ms. Corder began to observe that suddenly her work was now in question. There were made up problems, exaggerations, and false accusations of Ms. Corder not completing tasks. This became such a problem that Ms. Corder began writing rebuttals to recap her work product with evidence to prove such accusations were false. This back and forth was exhausting —after weeks of doing the actual work— to then have to write reports and audits to prove that she had done her job.

18.    In addition, Ms. Corder's weekly check-ins with Ms. Roberts became increasingly hostile. Ms. Roberts would yell at Ms. Corder and make statements such as, "we know you're in

on it" in reference to Ms. Corder addressing safety concerns about COVID-19 in her direct reports. Ms. Roberts' hostility became so taxing on Ms. Corder that Ms. Corder sought counseling with a therapist during what would be the last few months of her tenure at Community of Hope. After one particularly rough check-in with her supervisor, Ms. Corder again reached out to Ms. Jennings in Human Resources to inform her of how uncomfortable Ms. Corder's professional relationship with Ms. Roberts was becoming, compounded by false accusations and fabricated issues about her work. Ms. Jennings requested that Ms. Corder compose and send an email to her detailing her concerns so that the Human Resources team could review it.

19.    On or about April 23, 2020, Sara Cartmill of the Housing Department was emailed in reference to a department question that came into the complaint line. Ms. Corder did not immediately hear back from Ms. Cartmill and Ms. Corder re-sent the message the following week and Ms. Cartmill sent an email acknowledging receipt of the communication from Ms. Corder.

20.    On May 12, 2020, at 1:16 p.m., Ms. Corder sent the email to Ms. Jennings and Alisha Willoughby. Among other things, Ms. Corder's email described her current and completed projects in detail and her concerns about communication with Ms. Roberts.

21.    After the May 12, 2020 email, Human Resources contacted Ms. Corder and informed her that they would be starting an internal Human Resources investigation stemming from her report against Ms. Roberts. Ms. Corder asked what the purpose of the investigation was, and she was told that it was standard Community of Hope protocol to look into matters like this. Ms. Corder agreed.

22.     On May 18, 2020, a scheduled meeting between Ms. Corder, Ms. Jennings, and the Director of Human Resources, Stephanie Leonetti, was held. At the meeting, all of Ms. Corder's concerns were discussed and Ms. Corder was led to believe that someone was finally going to address the issues.

23.     On May 21, 2020, on a day Ms. Corder was scheduled off, Ms. Corder took a Teams call with Ms. Jennings and Ms. Leonetti and was informed that she was being terminated, effective immediately. Ms. Corder inquired as to the grounds of her termination and was told that an email she had provided as an audit to prove she had done her work had an incorrect date on it. Ms. Corder was told that she was terminated for "falsification of a document." Community of Hope accused Ms. Corder of falsifying a date on the report she sent to Ms. Roberts and Ms. Jennings of Human Resources over a month prior; this email was never responded to or addressed until it was used as a reason for termination five weeks later. This email in question was to investigate the dates that were not able to be properly retrieved in the email system, and the date in question concerned a malfunctioning complaint line inbox caused by a Community of Hope system malfunction when the email systems were switched, which was the issue at hand rather than Ms. Corder not completing job tasks, as implied by Ms. Roberts. The malfunctioning complaint line inbox prevented Ms. Corder from using reliable data and she could not retrieve the exact date because of the system glitch prevented her from retrieving past sent emails, but she reported the issue to Ms. Roberts, Ms. Jennings, and Keith Shanklin of the IT Department. An IT ticket was generated for this issue and validates the systemic malfunction. On or about April 23, 2020, Sara Cartmill of the Housing Department was emailed initially in reference to a department question that came into the

complaint line. Ms. Corder did not hear back from Ms. Cartmill and she re-sent the message the following week. Ms. Corder's account is corroborated by an email from Ms. Cartmill, who sent an email acknowledging receipt of the April 23, 2022 communication from Ms. Corder. Additionally, Mr. Shanklin worked with Ms. Corder and documented the issue in the IT ticket Ms. Corder submitted in April, 2020 and Mr. Shanklin sent an email to Ms. Roberts explaining that the outbox of the complaint email box was not updating properly, meaning Ms. Corder was unable to see the messages she had sent from that mailbox. This issue was not revisited until it was used as Ms. Corder's termination, even though Ms. Corder asked for the audit sent to be reviewed and discussed for clarification of the issue at hand. The audit report was never discussed until her termination meeting.

24.    On May 20, 2020, Ms. Leonetti and Ms. Jennings sent Ms. Corder a memorandum entitled, Termination of Employment. Ms. Corder responded as follows: "I can only assume at this time that my termination was taken in retaliation for my engagement in a protected activity. It was my expectation that upon contacting HR, that the issue described within this letter (and others mentioned during my interview with HR) would have been investigated in an objective manner; however, I was terminated before the investigation even started. I did not falsify a document, I incorrectly recalled the date of the first email, which I could not verify for the reasons listed above. False accusations were a major issue I was dealing with during my last days at COH. This termination action furthers my belief that I was being targeted for some reason."

25.    As a result of her sudden termination after eight months of employment, Ms. Corder has suffered severe emotional distress requiring mental health counseling, and irreparable harm to her professional reputation.

### COUNT I
**Violation of Section 1981 of the Civil Rights Act of 1866**
**42 U.S.C. § 1981**
**Race Discrimination, Disparate Treatment, and Hostile Work Enviroment**

26.    Plaintiff realleges and incorporates by reference the above paragraphs as if full stated herein.

27.    At all pertinent times, Defendant was an employer subject to provisions of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

28.    At all pertinent times, Plaintiff was an employee entitled to protection under Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

29.    Section 1981 prohibits discrimination on the basis of race and the creation of a hostile work environment in the making and enforcing of contracts, with respect to an employee's compensation, terms, conditions, or privileges of employment.

30.    Defendant, in violation of 42 U.S.C. § 1981, discriminated against Ms. Corder based on her race. First, Community of Hope failed to provide her with a ninety-day evaluation after she commenced employment in violation of its own personnel policies. Next, Community of Hope failed to follow its own personnel policies and investigate Ms. Corder's claims of a hostile work environment but instead targeted Ms. Corder for discipline and termination by directing Ms. Jennings to participate in Ms. Corder's one on one meetings with Ms. Roberts. Ms. Corder was terminated for a minor error without being given an opportunity to respond to the accusation. The

13

reasons for the termination are false and they followed immediately after Ms. Corder reported that her supervisor was creating a hostile work environment and immediately after she began her investigation of a racial complaint against a Caucasian clinician of Community of Hope. In contrast, complaints by Ms. Corder's Caucasian colleagues were taken seriously and investigated and Community of Hope did not discipline or terminate Caucasian employees because they made a complaint against their supervisor or colleagues.

31.     As a direct and proximate cause of the Defendant's actions, Plaintiff Corder has suffered and continues to suffer harm, including but not limited to loss of employment, financial loss, humiliation, embarrassment, emotional distress, anxiety, high blood pressure, and mental anguish.

32.     Defendant engaged in its discriminatory actions described above with malice or with reckless indifference to Plaintiff's legal rights.

33.     Defendant has no legitimate business reason for any such acts.

34.     Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendant may have engaged in other discriminatory practices that are not yet fully known.

## COUNT II
### Violation of Section 1981 of the Civil Rights Act of 1866
### 42 U.S.C. § 1981
### Retaliation

35.     Plaintiff realleges and incorporates by reference the above paragraphs as if full stated herein.

14

36.    At all pertinent times, Defendant was an employer subject to provisions of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

37.    At all pertinent times, Plaintiff was an employee entitled to protection under Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

38.    Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 prohibits discrimination in employment and retaliation against an employee for engaging in protected activities including filing complaints of discrimination. Section 1981 further prohibits retaliation against an employee for, *inter alia*, complaining of or otherwise opposing discrimination based on race.

39.    Plaintiff engaged in protected activity when she complained that Ms. Roberts was creating a hostile work environment.

40.    Defendant, in violation of 42 U.S.C. § 1981, retaliated against Ms. Corder for engaging in protected activities. After Ms. Corder complained that Ms. Roberts was creating a hostile work environment, Community of Hope failed to follow its own personnel policies and investigate Ms. Corder's claims of a hostile work environment but instead targeted Ms. Corder for discipline and termination by directing Ms. Jennings to participate in Ms. Corder's one on one meetings with Ms. Roberts. Ms. Corder was terminated for a minor error without being given an opportunity to respond to the accusation. The reasons for the termination are false and they followed immediately after Ms. Corder reported that her supervisor was creating a hostile work environment. Complaints by Ms. Corder's Caucasian colleagues were taken seriously and

15

investigated, and Community of Hope did not discipline or terminate Caucasian employees because they made a complaint against their supervisor or colleagues.

41.    As a direct and proximate cause of the Defendant's actions, Plaintiff Corder has suffered and continues to suffer harm, including but not limited to loss of employment, financial loss, humiliation, embarrassment, emotional distress, anxiety, high blood pressure, and mental anguish.

42.    Defendant engaged in its retaliatory actions described above with malice or with reckless indifference to Plaintiff's legal rights.

43.    Defendant has no legitimate business reason for any such acts.

44.    Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendant may have engaged in other retaliatory practices that are not yet fully known.

**COUNT III**
**Breach of Implied Contract**

45.    Plaintiff realleges and incorporates by reference the above paragraphs as if full stated herein.

46.    Plaintiff began employment with Defendant in September 2019. Plaintiff's employment was subject to certain employment conditions and formed an implied employment contract. Plaintiff was informed that she would receive a three-month evaluation. In addition, Community of Hope's policies permitted and encouraged her to file internal complaints of harassment. In reliance upon these employment conditions, Plaintiff requested a three-month evaluation, and later filed a complaint with Human Resources that her supervisor had engaged in

16

micro-aggressive behavior and created a hostile work environment and following her complaint, a Human Resources staff person was assigned to all meetings with her and her supervisor. In breach of her employment agreement, Plaintiff Corder was terminated for making an internal complaint against her supervisor.

47.    Defendant has no legitimate business reason for any such acts.

48.    As a direct and proximate cause of the Defendant's actions, Plaintiff Corder has suffered and continues to suffer harm, including but not limited to loss of employment, financial loss, humiliation, embarrassment, emotional distress, anxiety, high blood pressure, and mental anguish.

## COUNT IV
### Detrimental Reliance/Promissory Estoppel

49.    Plaintiff realleges and incorporates by reference the above paragraphs as if full stated herein.

50.    A party states a claim for detrimental reliance/promissory estoppel when one party to an agreement makes promises to the second party and encourages the reliance of the second party and fails to perform the agreed upon promises.

51.    Plaintiff began employment with Defendant in September 2019. Plaintiff's employment was subject to certain employment conditions which Plaintiff reasonably relied upon in accepting employment at Community of Hope. Plaintiff was informed that she would receive a three-month evaluation. In addition, Community of Hope's policies permitted and encouraged her to file internal complaints of harassment. In reliance upon these employment conditions, Plaintiff requested a three-month evaluation, and later filed a complaint with Human Resources that her

supervisor had engaged in micro-aggressive behavior and created a hostile work environment and following her complaint, a Human Resources staff person was assigned to all meetings with her and her supervisor. Plaintiff Corder was terminated for making an internal complaint against her supervisor. Plaintiff Corder relied to her detriment of Defendant's promises that she could report a hostile work environment without adverse action being taken against her. Having encouraged and required its employees to report all actions which constituted a hostile work environment, Defendant is estopped from terminating Plaintiff because she reported a hostile work environment.

52.     Defendant has no legitimate business reason for any such acts.

53.     As a direct and proximate cause of the Defendant's actions, Plaintiff Corder has suffered and continues to suffer harm, including but not limited to loss of employment, financial loss, humiliation, embarrassment, emotional distress, anxiety, high blood pressure, and mental anguish.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Corder prays as follows:

A.     That the Court issue an Order declaring Defendant's actions to be a violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the District of Columbia common law claims and declaring Plaintiff eligible to receive equitable and other relief;

B.     Enter judgment against Defendant;

C.     Issue a permanent injunction prohibiting Defendant from engaging in any discriminatory terminations and retaliation;

D.      Enter judgment in favor of Plaintiff against Defendant for all equitable monetary damages available under the law, including but not limited to back pay and front pay in amounts to be determined at trial and all bonuses to which Plaintiff is entitled;

E.      Order Defendant to refrain from any retaliation against Plaintiff, or any other person, for participating in or supporting this case in any manner;

F.      Order Defendant, individually and collectively, to pay compensatory and punitive damages in an amount no less than one million dollars ($1,000,000.00);

G.      Order Defendant to pay Plaintiff's reasonable attorneys' fees, expert fees and costs; and

H.      Order Defendant to pay pre-judgment and post-judgment interest as provided by law.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all claims against Defendant.

Date: September 20, 2022                          Respectfully submitted,

                                                  _____/s/ David A. Branch_____
                                                  David A. Branch, Esq.
                                                  D.C. Bar No. 438764
                                                  Law Office of David A. Branch &
                                                  Associates, PLLC
                                                  1828 L Street, N.W., Suite 820
                                                  Washington, D.C. 20036
                                                  Phone: (202) 785-2805
                                                  Fax: (202) 785-0289
                                                  Email: davidbranch@dbranchlaw.com

# Superior Court of the District of Columbia

### CIVIL DIVISION- CIVIL ACTIONS BRANCH
### INFORMATION SHEET

ADRIENNE CORDER

Case Number: 2022 CA 004284 B

vs

Date: September 20, 2022

COMMUNITY OF HOPE

☐ One of the defendants is being sued in their official capacity.

| | |
|---|---|
| **Name:** *(Please Print)*<br>David A. Branch | **Relationship to Lawsuit**<br>☒ Attorney for Plaintiff |
| **Firm Name:**<br>Law Office of David A. Branch & Associates, PLLC | ☐ Self (Pro Se) |
| **Telephone No.:**     Six digit Unified Bar No.:<br>(202) 785-2805          438764 | ☐ Other: _____ |

TYPE OF CASE: ☐ Non-Jury    ☐ 6 Person Jury    ☒ 12 Person Jury

Demand: $ 1,000,000.00                  Other: *See Prayer For Relief*

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.: Not Applicable    Judge: Not Applicable    Calendar #: Not Applicable

Case No.: _____    Judge: _____    Calendar#: _____

---

**NATURE OF SUIT:**    *(Check One Box Only)*

**A. CONTRACTS**                    **COLLECTION CASES**

☐ 01 Breach of Contract         ☐ 14 Under $25,000 Pltf. Grants Consent  ☐ 16 Under $25,000 Consent Denied
☐ 02 Breach of Warranty         ☐ 17 OVER $25,000 Pltf. Grants Consent   ☐ 18 OVER $25,000 Consent Denied
☐ 06 Negotiable Instrument      ☐ 27 Insurance/Subrogation               ☐ 26 Insurance/Subrogation
☐ 07 Personal Property               Over $25,000 Pltf. Grants Consent         Over $25,000 Consent Denied
☒ 13 Employment Discrimination  ☐ 07 Insurance/Subrogation               ☐ 34 Insurance/Subrogation
☐ 15 Special Education Fees          Under $25,000 Pltf. Grants Consent        Under $25,000 Consent Denied
                                ☐ 28 Motion to Confirm Arbitration
                                     Award (Collection Cases Only)

**B. PROPERTY TORTS**

☐ 01 Automobile                 ☐ 03 Destruction of Private Property    ☐ 05 Trespass
☐ 02 Conversion                 ☐ 04 Property Damage
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

**C. PERSONAL TORTS**

☐ 01 Abuse of Process           ☐ 10 Invasion of Privacy               ☐ 17 Personal Injury- (Not Automobile,
☐ 02 Alienation of Affection    ☐ 11 Libel and Slander                      Not Malpractice)
☐ 03 Assault and Battery        ☐ 12 Malicious Interference            ☐ 18 Wrongful Death (Not Malpractice)
☐ 04 Automobile- Personal Injury ☐ 13 Malicious Prosecution            ☐ 19 Wrongful Eviction
☐ 05 Deceit (Misrepresentation) ☐ 14 Malpractice Legal                 ☐ 20 Friendly Suit
☐ 06 False Accusation           ☐ 15 Malpractice Medical (Including Wrongful Death)  ☐ 21 Asbestos
☐ 07 False Arrest               ☐ 16 Negligence- (Not Automobile,      ☐ 22 Toxic/Mass Torts
☐ 08 Fraud                           Not Malpractice)                  ☐ 23 Tobacco
                                                                       ☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE          IF USED

# Information Sheet, Continued

**C. OTHERS**

☐ 01 Accounting
☐ 02 Att. Before Judgment
☐ 05 Ejectment
☐ 09 Special Writ/Warrants
    (DC Code § 11-941)
☐ 10 Traffic Adjudication
☐ 11 Writ of Replevin
☐ 12 Enforce Mechanics Lien
☐ 16 Declaratory Judgment

☐ 17 Merit Personnel Act (OEA)
    (D.C. Code Title 1, Chapter 6)
☐ 18 Product Liability

☐ 24 Application to Confirm, Modify,
    Vacate Arbitration Award (DC Code § 16-4401)
☐ 29 Merit Personnel Act (OHR)
☐ 31 Housing Code Regulations
☐ 32 Qui Tam
☐ 33 Whistleblower

**II.**

☐ 03 Change of Name
☐ 06 Foreign Judgment/Domestic
☐ 08 Foreign Judgment/International
☐ 13 Correction of Birth Certificate
☐ 14 Correction of Marriage
    Certificate
☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
☐ 27 Petition for Civil Asset Forfeiture (Currency)
☐ 28 Petition for Civil Asset Forfeiture (Other)

☐ 15 Libel of Information
☐ 19 Enter Administrative Order as
    Judgment [ D.C. Code §
    2-1802.03 (h) or 32-151 9 (a)]
☐ 20 Master Meter (D.C. Code §
    42-3301, et seq.)

☐ 21 Petition for Subpoena
    [Rule 28-I (b)]
☐ 22 Release Mechanics Lien
☐ 23 Rule 27(a)(1)
    (Perpetuate Testimony)
☐ 24 Petition for Structured Settlement
☐ 25 Petition for Liquidation

**D. REAL PROPERTY**

☐ 09 Real Property-Real Estate
☐ 12 Specific Performance
☐ 04 Condemnation (Eminent Domain)
☐ 10 Mortgage Foreclosure/Judicial Sale
☐ 11 Petition for Civil Asset Forfeiture (RP)

☐ 08 Quiet Title
☐ 25 Liens: Tax / Water Consent Granted
☐ 30 Liens: Tax / Water Consent Denied
☐ 31 Tax Lien Bid Off Certificate Consent Granted

_____
Attorney's Signature

September 20, 2022
_____
Date

CV-496/ June 2015



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

ADRIENNE CORDER
_____
                                    Plaintiff

                vs.                                    Case Number  **2022 CA 004284 B**

COMMUNITY OF HOPE
_____
                                    Defendant

### SUMMONS

To the above named Defendant:

        You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

        You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

David A. Branch                                    _Clerk of the Court_
_____
Name of Plaintiff's Attorney

Law Office of David A. Branch & Assoc. PLLC        By _____
_____                                    Deputy Clerk
Address
1828 L Street, N.W., Suite 820, Washington, D.C. 20036

(202) 785-2805                                    Date  **9/22/2022**
_____
Telephone
如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화주십시오    የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

        IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

        If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
Sección de Acciones Civiles
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

_____
                        Demandante

contra

                                                    Número de Caso: _____

_____
                        Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_____          *SECRETARIO DEL TRIBUNAL*
Nombre del abogado del Demandante

                                         Por: _____
_____                        Subsecretario
Dirección

_____

                                         Fecha _____
_____
Teléfono

如需翻译，请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828

빠른번역을위해서는 (202) 879-4828 로전화해주십시오      ያማርኛ  ትርጉም  ለማግኘት (202) 879-4828  ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                          Super. Ct. Civ. R. 4