UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ADRIENNE CORDER,

        *Plaintiff*,

v.

COMMUNITY OF HOPE,

        *Defendant*.

Civil Action No. 1:22-cv-03676 (CJN)

**MEMORANDUM OPINION**

Plaintiff Adrienne Corder alleges that her former employer, Community of Hope, engaged in race-based employment discrimination against her and breached various claimed contractual duties and promises. For the reasons that follow, Corder has failed to state any claim and the Court will **GRANT** Community of Hope's motion to dismiss.

**I. Background**

1. Adrienne Corder is an African American female who joined Community of Hope as the Associate Director of Health and Support Services in September of 2019. Compl. ¶ 5, ECF No. 1-1. Her complaint details several perceived problems during her 8-month tenure at the company.

First, Corder takes issue with the company's failure to provide her with a 90-day performance evaluation. "Community of Hope provides all employees with an assessment of their work after their first [90] days of employment." Compl. ¶ 6. But Corder's initial supervisor left the company before she could give Corder such an assessment. *Id.* Corder's new supervisor, Victoria Roberts, "a Caucasian female," "stated that she was not using the original ninety-day evaluation completed by the previous supervisor, and that she was completing another ninety-day

1

evaluation that Ms. Roberts herself wrote." Compl. ¶¶ 5, 6. Corder never received that evaluation prior to her termination. Compl. ¶ 6.

Second, Corder takes issue with the series of events that led to her termination. Corder alleges that Roberts acted unprofessionally towards her. The first incident happened on February 26, 2020, at a weekly check-in when Corder asked Roberts if certain grant money could be used to increase her salary. Compl. ¶ 10. Roberts responded, "[w]hy would you ask for that? We pay all your bills with your salary. No, you don't get that and that's not the way CoH does things." *Id.* Corder asserts that this was a "micro-aggressive response." *Id.*

Following this interaction, Corder "reached out" to HR regarding the comments, and HR suggested that Corder could "discuss the issue with Ms. Roberts herself." Compl. ¶ 11. At the next check-in, Corder "mentioned [to Roberts] how she had felt offended by" the comments. Compl. ¶ 12. Roberts did not recall making the statement, but "said that she was sorry if something she said came out wrong." *Id.* Roberts then followed up with a "very long, detailed email" which "reviewed everything that Ms. Roberts did remember saying and restated that [she] did not recall the insult." Compl. ¶ 13. Corder did not reply to the email. *Id.*

At the following check-in (and thereafter), a HR representative, Karen Jennings, was present because Corder and Roberts "were having 'communication issues.'" Compl. ¶ 14. Corder "felt very strange" about Jennings' presence and raised the issue with Jennings. Compl. ¶ 15. Corder expressed that after she complained about Roberts' alleged "micro-aggressive comment, "she felt that she was being treated differently at Community of Hope." And she asked whether Jennings' presence "was part of some sort of disciplinary action and asked for a mediation plan." Compl. ¶ 17. Jennings "assured" Corder that she was simply "serving as an unbiased witness." *Id.*

2

Corder alleges that, at this point, "suddenly her work was . . . in question" and that there "were made up problems, exaggerations, and false accusations of [her] not completing tasks." *Id.* Corder also alleges that Roberts "became increasingly hostile" at their weekly check-ins. Roberts, Corder alleges, yelled at Corder and at one point stated "we know you're in on it" in reference to "Corder addressing safety concerns about COVID-19 in her direct reports." Compl. ¶ 18.

Corder again reached out to Jennings "to inform her of how uncomfortable" her "professional relationship with Ms. Roberts was becoming, compounded by false accusations and fabricated issues about her work." *Id.* Jennings asked Corder to "compose and send an email to her detailing her concerns so that the Human Resources team could review it." *Id.*

That email, containing seemingly random notes interspersed with complaints, is focused solely on standard work-related concerns, such as complaints about "receiving unclear direction on an item," absences at meetings, lack of clarity regarding roles, and email response times. Corder's email contains no mention of race-based issues or even claimed "microaggressions." *See* Ex. A, Mot. to Dismiss, ECF No. 3-2.[1] Instead, Corder stated, "I enjoy my work here at COH." *Id.* Corder also sent another email "provided as an audit to prove that she had done her work." Compl. ¶ 23.

Human Resources then let Corder know "that they would be starting an internal Human Resources investigation stemming from her report" based on its "standard . . . protocol to look into

---

[1] Corder's complaint refers to this email and certain rules that are presumably found in Community of Hope's employee handbook. Both documents are central to her claims. But she did not attach either to the complaint. Defendant argues that in these circumstances the Court can consider the documents without converting the motion to a motion for summary judgment. Mot. to Dismiss at 3-5; *see Strumsky v. Wash. Post.*, 842 F. Supp. 2d. 215, 217-18 (D.D.C. 2012). Plaintiff does not oppose doing so, so the Court will consider them.

matters like this." Compl. ¶ 21. About a week later, Corder met with Jennings and the Director Human Resources about her complaint. Compl. ¶ 22.

Nine days after Corder sent her email detailing her concerns, she was fired. Compl. ¶ 23. Corder was told that the "audit" email she had sent "to provide that she had done her work" contained "an inaccurate date" and as a result she was being terminated for "falsification of a document." *Id.* Corder does not deny that she did indeed provide an incorrect date in her "audit" email. *See* Compl. ¶¶ 23, 24.

Finally, Corder alleges that during her employment she "witnessed and experienced several interactions that indicated racial bias in the workplace." Compl. ¶ 7. She asserts that Community of Hope "hired a number of . . . inexperienced and culturally insensitive Caucasian clinicians" despite having "no connection to the community (Ward 7/8) being served." Compl. ¶ 7. Hiring these white doctors, Corder implies, must have been the product of racial bias because Community of Hope's patients require "culturally sensitive community committed providers." Compl. ¶ 7. Moreover, Corder alleges, patients "frequent[ly] complain[ed]" about the "quality of healthcare [provided] by Caucasian doctors engaging in dismissive and discriminatory conduct." *Id.* According to Corder, senior management failed to taken action to address these issues. At the time of her termination, Corder was in the midst of "handling" one such complaint. *Id.* Corder also witnessed a "Caucasian employee" commit "multiple professional mishaps" and then "attribute her mishaps onto her mostly African American team." This practice apparently "went on without an investigation for many months." Compl. ¶ 8.

In addition, Corder alleges, "[t]here was a perception at Community of Hope among African American employees that their advancement prospects were limited." Compl. ¶ 8. And Corder observed that "some of Community of Hope's executive team subjected its African

4

American female employees to unnecessary micromanaging, condescending, belittling, and argumentative behaviors within the workplace, unlike how they treated Caucasian employees." Compl. ¶ 8.

Corder also alleges that she heard Roberts make objectionable comments.  On one occasion, Corder asserts, Roberts "suggested in a leadership meeting that workplace signs advising patients to take COVID-19 precautions were 'unnecessary because our patients[] don't read anyway.'" *Id.*  On another occasion, Roberts stated that she "would rather not hire a potential employee" from the District's Southeastern Hospital "because of the reputation of the 'people' that work at 'that hospital.'" *Id.*

2. More than two years after her termination, Corder filed suit in D.C. Superior Court, and Community of Hope removed the action here.  Her complaint raises five main theories.  *See generally* Compl.  Three are under 42 U.S.C. § 1981, which provides all people with "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."  First, she alleges that she was discriminated based on her race through Community of Hope's failure to give her a ninety-day evaluation, Jennings' participation in Corder's one-on-one meetings with Roberts, and her termination.  Second, she alleges retaliation, claiming that Jennings' presence in her meetings with Roberts and her termination were in retaliation to her complaints.  Finally, she alludes to a hostile work environment claim.

Corder raises two additional theories under D.C. law.  First, she claims that Community of Hope breached implied contract terms by failing to provide a ninety-day evaluation and terminating her for making a complaint.  Second, she alleges promissory estoppel based on her claims that she reasonably relied to her detriment on promises that she would receive a ninety-day evaluation and that she could make a complaint without repercussion.

5

## II. Legal Standards

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts must accept as true all factual allegations in a complaint, the same deference is not owed to legal conclusions. *Id.* Plaintiffs therefore cannot rely on "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* Nor are courts "bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

## III. Analysis

### A. Retaliation

Corder's retaliation claim fails for a simple reason: Her complaints to HR were not protected activities against which retaliation is prohibited. A retaliation claim under 18 U.S.C. § 1981 requires a protected activity, an adverse employment action, and a causal connection between the two. *See Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015). "Not every complaint garners its author protection." *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006). For Corder's complaints to HR to qualify as a protected activity, her complaints cannot have been "generic"; they must have "oppose[d] an employment practice made unlawful by the statute under which she has filed her claim of retaliation." *Richardson v. Petasis*, 160 F. Supp.3d 88, 130 (D.D.C. 2015). For example, "complaining about being 'picked on,' without mentioning discrimination . . . does not constitute protected activity, even if the employee honestly believes she is the subject of . . . discrimination." *Broderick*, 437 F.3d at 1232 (citation omitted).

Corder's complaints fail that test. She does not allege that any of her complaints mentioned race discrimination. That is true of her initial complaint to Jenkins after the allegedly "micro-aggressive" comment. And is true of the email she sent shortly before her termination—that email detailed only standard workplace complaints. Thus, even if it is plausible that Community of Hope terminated Corder because of her complaints, Community of Hope did not violate § 1981 by doing so.

### B. Hostile Work Environment

Corder's hostile work environment claim—based largely on suppositions that the company was biased against *other* employees—does not work either. "To make out a hostile work environment claim, a plaintiff must allege that she was subjected to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Doe #1 v. Am. Fed'n of Gov't Emps.*, 554 F. Supp. 3d 75, 107 (D.D.C. 2021) (citations omitted). "There must be a linkage between the hostile behavior and the plaintiff's membership in a protected class for a hostile work environment claim to proceed." *Id.* (citations omitted).

Corder's complaint does not suffice. Her allegations about racial bias generally at Community of Hope do not involve allegations that the behavior was directed towards her. *See Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 108 (D.D.C. 2005) ("When racial statements are not made directly to a plaintiff, generally a hostile environment cannot be established."). And she does not seem to allege facts indicating that the "micro-aggressive" comments towards her were discriminatory. In any event, "other courts have deemed circumstances that were much worse than this not to qualify." *See id.* at 109 (noting that no hostile work environment was found in a case where a co-worker used a racial slur and told the plaintiff "black women were at the bottom" or in a case "where plaintiff [was] exposed to daily racist graffiti, overheard white co-workers using

7

racial slurs 13 times over four years, and [was] referred to by [a] manager with a racial slur."). In fact, months into the job, Corder noted that she "enjoy[ed] [her] work here at COH." Ex. A, Mot. to Dismiss.

### C. Race-Based Discrimination

As for her race-based discrimination claims, she has not plausibly alleged that race was the but-for cause of the challenged actions. To prevail on a § 1981 claim, "a plaintiff must initially plead . . . that but for race, [she] would not have suffered the loss of a legally protected right." *Comcast v. Nat'l Assoc. of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 10019 (2020). To that end, Corder must "allege some facts that demonstrate that [her] race was the reason for the defendant's actions." *Doe #1 v. Am. Fed'n of Gov't Emps.*, 554 F. Supp 3d 75, 102 (D.D.C. 2021); *Apollo v. CVS Pharmacy*, No. 17-cv-1771, 2019 WL 147475, at *2 (D.D.C. Jan 9, 2019). A "plaintiff cannot merely invoke her race in the course of a claim's narrative and automatically be entitled to pursue relief." *Bray v. RHT, Inc.,* 748 F. Supp. 3, 5 (D.D.C. 1990); *see also Ndondji v. InterPark Inc.*, 768 F. Supp. 2d 263, 274 (D.D.C. 2011) (explaining that "occasional reference[s]" to race in a complaint is "insufficient to make out a section 1981 action").

Here, Corder alleges no facts connecting her race to the challenged actions. Her allegations regarding race fall into two general categories: (1) that she is African American and that she was mistreated, and (2) general allegations of (what she viewed as) racially biased behavior in the company.

The first category, standing alone, is insufficient to make out a § 1981 claim: "[A]n argument that because [Plaintiff] was mistreated and because [Plaintiff] is black, there must be some connection between the two" does not cut it. *Mekuria v. Bank of Am.*, 883 F. Supp. 2d 10, 13–16 (D.D.C. 2011). As for the second category—her "oblique references" to allegedly race-based behavior on other occasions—they do not amount to an "alleg[ation] [of] facts to show that

8

race was the reason for defendant's action." *Mohamed v. George Washington University*, No. 22-cv-00812, 2022 WL 3211806, at *4 (D.D.C. Aug. 9, 2022). Corder does not allege that the decisionmaker behind her termination engaged in any racially biased behaviors. (Indeed, she does not even allege who the decisionmaker was). And she does not allege facts illustrating such a pervasively racially biased workplace that it becomes "plausible" as opposed to merely "conceivable" that she would not have been terminated, would have been given a 90-day review, or would not have had HR sitting in on her meetings with Roberts, had she been a different race. *Iqbal*, 556 U.S. at 680. This is especially so in a case like this, where Corder's allegations cut both ways: Corder was *hired* by Defendant less than a year before her termination; Corder stated that after months on the job, she "enjoy[ed] her work" at Community of Hope; and Corder stated that things changed only after she complained about Roberts' allegedly "micro-aggressive" comments, not that she was consistently treated poorly.

Moreover, even setting aside those allegations that cut the other way, and even assuming Corder's "allegations are consistent with" incidents of racially biased behavior at Community of Hope (itself a dubious proposition), her allegations do not "plausibly establish" that race was the but-for cause *of any actions Corder complains of*. This is especially so because there are "[o]bvious alternative explanation[s]" that have nothing to do with Corder's race. *Iqbal*, 556 U.S. at 682.

Start with the company's failure to give her a 90-day evaluation.[2] Corder acknowledges that her initial supervisor resigned before that supervisor could deliver a 90-day evaluation. Compl. ¶ 6. And she acknowledges that her new supervisor, Roberts, wished to complete a 90-

---

[2] The Court assumes without deciding that all of the complained of actions are the sort of negative actions that can give rise to liability under § 1981.

9

day evaluation herself.  *Id.*  Corder also acknowledges that her short tenure at the company was punctuated by disruptions from the COVID-19 pandemic.  *See id.* at ¶ 14.  And Corder does not allege that timeliness for these 90-day evaluations was generally a priority for the company.  Moreover, it is not as if Roberts was unwilling to provide Corder with feedback—Roberts met with Corder weekly.

Regarding Jennings' participation in Corder's meetings with Roberts, neither Corder's allegations about Roberts' alleged "micro-aggressive" comments, nor her allegations regarding Jennings' statements to Corder about those comments or about Jennings' participation in the meetings, make any allusion to race.  Corder alleges facts that suggest only one plausible reason for HR's presence:  Corder raised concerns to HR about comments a superior made to her, so HR sat in on future meetings to monitor the situation.  *See* Compl. ¶¶ 14-18.

It is similarly implausible to conclude Community of Hope's decision to fire Corder was race-based in light of alternative explanations.  In the midst of Corder's complaints to the company, there were concerns about Corder, including "concerns . . . regarding . . . follow-up on deliverables in a timely" manner.  Ex. A, Mot. to Dismiss.  Corder acknowledges she provided the company an "audit to prove she had done her work," Compl. ¶ 11, but also acknowledges that in that "audit" she misrepresented the date on which she sent an email.  *See* Compl. ¶ 11, 12.  And Corder acknowledges that the company pointed to that misrepresentation as grounds for firing her.  Compl. ¶ 11.  Whether or not her misstatement should be categorized as a falsification or as mere negligence, a termination for that reason is not termination based on race.

Of course, Corder contends that Community of Hope's explanation was merely pretextual.  But this theory works only if Community of Hope would not have normally fired an employee for a similar misrepresentation.  (If it would have, any other motive for firing Corder would not be the

10

but-for cause). And Corder alleges no facts indicating that Community of Hope (unlike most other employers) does not take misrepresentations or indications of untrustworthiness seriously.

Even setting that aside and assuming pretext, none of Corder's allegations support a view that Community of Hope's citing of the alleged falsification was a pretext for a *race*-based termination. Indeed, even assuming Community of Hope terminated Corder for some reason beyond her falsification, "the complaint itself gives reasons to believe," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 (2007), that Community of Hope's reliance on that reason is "not only compatible with, but indeed [is] more likely explained by" a desire to terminate Corder based on her incessant complaining. *Iqbal*, 556 U.S. at 680. (Indeed, that is more or less what Corder herself alleges regarding her theories of liability based on retaliation, breach of implied contract, and promissory estoppel.)

"[T]he complaint is replete with indications" to this effect. *Twombly*, 550 U.S. at 568. After all, even Corder's co-workers picked up on her propensity to rub others the wrong way. As Corder puts it, "[t]hroughout her employment at Community of Hope, Ms. Corder's co-workers routinely cautioned her to rein in her ambitious spirit for fear that she may be targeted." Compl. ¶ 8. Moreover, Corder details a series of complaints that could make any employer's patience wear thin. After Roberts responded (harshly, according to Corder) to the request for a salary increase just six months into the job, Corder complained to HR. When Corder was unable to work things out with Roberts, HR responded by having a representative sit in on Corder's meetings with Roberts. Then Corder complained about the HR representative's presence.

The next time Corder complained, HR invited Corder to send an email "detailing her concerns." Corder responded by sending a 13-page email detailing all of her complaints about the workplace (none of which concerned race). She complained that others were giving her "unclear

directions"; that she was given negative feedback for "missing one new change" in a document; and that she sometimes sent emails that "need[ed] a quick response," but that "the email was responded to the next day." *See* Ex. A, Mot. to Dismiss. Corder's email also detailed to the company her interactions with others, including one instance when someone raised concerns with Corder and Corder "interrupted [her] and told her to place her concerns in an email so [Corder] [could] discuss it with upper management." *Id.*

Based on "judicial experience and common sense," it is far "more likely" that this behavior, not Corder's race, would have made Community of Hope less than eager to cut Corder slack for her misrepresentation. *Iqbal*, 556 U.S. at 679, 680. Corder herself acknowledges that she started "being treated differently at Community of Hope" only after she complained about Roberts' allegedly "micro-aggressive" comments. Compl. ¶¶ 10, 17 ("Ms. Corder's own issues began after she addressed a micro-aggressive comment that Ms. Roberts made.").

In sum, nothing in the complaint beyond general (and basically unsupported) accusations of racial bias supports Corder's view that the misrepresentation she made in her "audit" was not the reason for her termination. And even assuming that there were reasons for her firing beyond that misrepresentation, none of Corder's allegations suggests that those reasons were race-based. *See Kalantar v. Lufthansa German Airlines*, 402 F.Supp.2d 130, 138 (D.D.C.2005) (dismissing section 1981 claim because the plaintiff did not offer any evidence that he was singled out on the basis of "racial or ethnic characteristics" as opposed to another reason).

### D. Breach of Implied Contract and Promissory Estoppel

Corder claims that Community of Hope breached an implied contractual promise, found in the company's "policies," not to fire her for making complaints. Compl. ¶ 46. The problem with this theory is that Community of Hope did not make such a promise. In the District of Columbia, "employment is presumed to be terminable at-will, that is, at any time and without cause." *Vasquez*

*v. Whole Foods Mkt.*, 302 F. Supp. 3d 36, 59 (D.D.C. 2018).  Corder alleges "Community of Hope's policies permitted and encouraged her to file internal complaints of harassment." Compl. ¶ 46.  That may be true, but that does mean that the company's policies contained language "limit[ng] its ability to terminate [Corder] without cause" in such situations. *Vasquez*, 302 F. Supp. 3d at 59.  Moreover, the handbook Corder seems to be referencing "expressly disclaims that it is a contract and affirms the at-will nature of the employment relationship." *Id.* at 59-60.  Thus, Corder "is wrong to suggest that [any] anti-retaliation provision creates a contractual right." *Bartolo v. Whole Foods Mkt. Grp.*, 412 F. Supp. 3d 35, 44 (D.D.C. 2019)

Corder also seeks to bind the company as a result of being "informed that she would receive a three-month evaluation."  But Corder has not explained what promises exactly were made to her, in what form those promises came, when those promises were made, and who made those promises.

Corder's promissory estoppel claim fails for similar reasons.  Regarding the promise of a 90-day review, again, her complaint does not adequately explain exactly what promises were made to her, when those promises were made, and who made those promises.  Without such details, it is impossible to say that she has stated a plausible claim of promissory estoppel. *See Alemayehu v. Abere*, 199 F. Supp. 3d 74, 83 (D.D.C. 2016).  And the express disclaimers in the handbook mean that any promises regarding non-retaliation "could not have induced legitimate reliance." *Shaughnessy v. Interpublic Group of Cos.*, 506 Fed. Appx. 369, 378 (6th Cir. 2012).

### IV.  Conclusion

For these reasons, Community of Hope's Motion to Dismiss is **GRANTED**.  An order will issue contemporaneously with this opinion.

DATE:  March 25, 2024

_____
CARL J. NICHOLS
United States District Judge